E-filing

Think Computer Corporation
884 College Avenue
Palo Alto, CA 94306-1303
Phone: +1 415 670 9350
E-Mail: legal@thinkcomputer.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

ADR  PSG

Filed
MAY - 6 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**THINK COMPUTER CORPORATION,**

　　　Plaintiff,

　　　v.

**DWOLLA, INC.; ACTBLUE, LLC; AIRBNB, INC.; POUND PAYMENTS ESCROW SERVICES, INC. DBA BALANCED PAYMENTS; CLINKLE CORPORATION; COINBASE, INC.; COINLAB, INC.; FACEBOOK, INC.; FACEBOOK PAYMENTS, INC.; GOPAGO, INC.; GUMROAD, INC.; SQUARE, INC.; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; A-GRADE INVESTMENTS, LLC; A-GRADE INVESTMENTS II, LLC; ANDREESSEN HOROWITZ LLC; ANDREESSEN HOROWITZ FUND I, LP; ANDREESSEN HOROWITZ FUND I-A, LP; ANDREESSEN HOROWITZ FUND I-B, LP; ANDREESSEN HOROWITZ FUND II, LP; ANDREESSEN HOROWITZ FUND II-A, LP; ANDREESSEN HOROWITZ FUND II-B, LP; ANDREESSEN HOROWITZ FUND III, LP; ANDREESSEN HOROWITZ FUND III (AIV), LP; ANDREESSEN HOROWITZ FUND III-A, LP; ANDREESSEN HOROWITZ FUND III-B, LP; ANDREESSEN HOROWITZ FUND III-Q, LP; DIGITAL SKY TECHNOLOGIES, LIMITED; DST GLOBAL, LIMITED; DSTG-2 2011 ADVISORS, LLC; DSTG-2 2011 INVESTORS DLP, LLC; DSTG-2 2011 INVESTORS ONSHORE, LP; KLEINER PERKINS CAUFIELD & BYERS, LLC; KLEINER PERKINS CAUFIELD & BYERS XIII, LLC; KLEINER PERKINS CAUFIELD & BYERS XIII FOUNDERS FUND, LLC; KLEINER PERKINS CAUFIELD & BYERS XIV, LLC; KLEINER PERKINS CAUFIELD &**

Case No.: CV13-02054

**COMPLAINT FOR**
**INJUNCTIVE RELIEF AND**
**JURY DEMAND**

BYERS XV, LLC; SEQUOIA CAPITAL, LLC;
SEQUOIA CAPITAL NEW PROJECTS, LLC;
SEQUOIA CAPITAL XII, LP; SC XII
MANAGEMENT, LLC; SEQUOIA CAPITAL
XII PRINCIPALS FUND, LLC; SEQUOIA
CAPITAL SCOUT FUND I, LLC; SEQUOIA
CAPITAL SCOUT FUND II, LLC; SEQUOIA
CAPITAL U.S. SCOUT FUND III, LLC;
SEQUOIA CAPITAL U.S. SCOUT SEED FUND
2013, LP; SEQUOIA TECHNOLOGY
PARTNERS XII, LP; Y COMBINATOR, LLC; Y
COMBINATOR FUND I, LP; Y COMBINATOR
FUND I GP, LLC; Y COMBINATOR FUND II,
LP; Y COMBINATOR FUND II GP, LLC; Y
COMBINATOR RE, LLC; Y COMBINATOR
S2012, LLC; Y COMBINATOR W2013, LLC;
BRIAN CHESKY; MAX LEVCHIN; YURI
MILNER; YISHAN WONG,

      Defendants.

Plaintiff Think Computer Corporation, by and for its complaint against ActBlue, LLC, Airbnb, Inc., Pound Payments Escrow Services, Inc. DBA Balanced Payments, Clinkle Corporation, Coinbase, Inc., Coinlab, Inc., Dwolla, Inc., Facebook, Inc., Facebook Payments, Inc., GoPago, Inc., Gumroad, Inc., Square, Inc., The Board of Trustees of the Leland Stanford Junior University, A-Grade Investments, LLC, A-Grade Investments II, LLC, Andreessen Horowitz, LLC, Andreessen Horowitz Fund I, LP, Andreessen Horowitz Fund I-A, LP, Andreessen Horowitz Fund I-B, LP, Andreessen Horowitz Fund II, LP, Andreessen Horowitz Fund II-A, LP, Andreessen Horowitz Fund II-B, LP, Andreessen Horowitz Fund III, LP, Andreessen Horowitz Fund III (AIV), LP, Andreessen Horowitz Fund III-A, LP, Andreessen Horowitz Fund III-B, LP Andreessen Horowitz Fund III-Q, LP, Digital Sky Technologies, Limited, DST Global, Limited, DSTG-2 2011 Advisors, LLC, DSTG-2 2011 Investors DLP, LLC, DSTG-2 2011 Investors Onshore, LP, Kleiner Perkins Caufield & Byers, LLC, Kleiner

Perkins Caufield & Byers XIII, LLC, Kleiner Perkins Caufield & Byers XIII Founders Fund, LLC, Kleiner Perkins Caufield & Byers XIV, LLC, Kleiner Perkins Caufield & Byers XV, LLC, Sequoia Capital, LLC, Sequoia Capital New Projects, LLC, Sequoia Capital XII, LP, SC XII Management, LLC, Sequoia Capital XII Principals Fund, LLC, Sequoia Capital Scout Fund I, LLC, Sequoia Capital Scout Fund II, LLC, Sequoia Capital U.S. Scout Fund III, LLC, Sequoia Capital U.S. Scout Seed Fund 2013, LP, Sequoia Technology Partners XII, LP, Y Combinator, LLC, Y Combinator Fund I, LP, Y Combinator Fund I GP, LLC, Y Combinator Fund II, LP, Y Combinator Fund II GP, LLC, Y Combinator RE, LLC, Y Combinator S2012, LLC, Y Combinator W2013, LLC, Brian Chesky, Max Levchin, Yuri Milner, and Yishan Wong (collectively, "Defendants"), avers as follows:

## INTRODUCTION AND SUMMARY

1.    Plaintiff brings this action under California Business & Professions Code § 17200 primarily due to myriad violations of the California Money Transmission Act ("MTA") and the Bank Secrecy Act ("BSA") and various other statutes and stemming from unlawful, unfair, fraudulent and deceptive business activities based thereupon.

2.    Broadly speaking, Defendants are Money Services Businesses ("MSBs"), also known as "money transmitters," and private investors in such MSBs. In California, MSBs are subject to federal laws and regulations governing MSB activity, as well as the California MTA and money transmission laws ("MTLs") of other states.

3.    The California MTA was enacted in 2010 and made effective on January 1, 2011, as then-Article 3 commencing at then-Section 1810, Chapter 14, Division 1 of the California Financial Code. The MTA is now Division 1.2, Sections 2000-2172 of the present California Financial Code. The MTA is presently enforced, at least in theory, by the California Department of Financial Institutions ("DFI").

4.    The MTA requires MSBs to obtain a money transmission license from the DFI in order to conduct any operations related to money transmissions. Plaintiff operated a successful MSB under the FaceCash trademark prior to July 1, 2011, when the MTA went into effect and began to regulate domestic money transmissions in California. Plaintiff attempted to comply with the MTA by meeting with DFI personnel as required to begin the license application process prior to the deadline, but encountered insurmountable difficulties with the DFI's unwritten and arbitrary policies that led to a federal lawsuit against the DFI pending in this Court, Case No. 5:11-cv-05496-HRL.

5.    Given the increasingly public difficulty associated with proper compliance with the MTA, Defendants decided to simply break the law while growing their businesses "under the radar," knowing that the likelihood of being caught was low, and in many cases fully aware that their activities would violate both state and federal law. Their investors either supported them in this regard, or were willfully negligent of the implications of funding unlicensed money transmitters.

## JURISDICTION

6.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and has jurisdiction over state law and common law claims pursuant to the doctrine of pendant jurisdiction.

7.    This Court possesses subject-matter jurisdiction for this action under 28 U.S.C. § 1332(a)(1) because many of the defendants are citizens of different states and/or countries from the plaintiff and the amount in controversy exceeds $75,000.

8.    This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); the requested damages under 28 U.S.C. § 1343(3); and attorney's fees under 42 U.S.C. § 1988.

## VENUE

9.   Venue is proper under 28 U.S.C. § 1391 in the Northern District of California because a substantial part of the actions or omissions giving rise to this case occurred within this District, and at least one Defendant resides or operates within this District.

## THE PARTIES

### Plaintiff

10.  Plaintiff Think Computer Corporation ("Think") is a privately-held Delaware corporation with its headquarters located at 884 College Avenue, Palo Alto, California 94306-1303 in Santa Clara County, in this District. Think operates in the Northern District of California and conducted interstate commerce as a money transmitter properly registered with the Financial Crimes Enforcement Network, a division of the United States Department of the Treasury ("FinCEN") until June 30, 2011 when the MTA went into effect. Think successfully obtained money transmission licenses in Alabama and Idaho before it was forced to cease money transmission operations. Think's President and CEO is Aaron Greenspan.

### Defendants

11.  Upon information and belief, Defendant ActBlue, LLC ("ActBlue") is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at 14 Arrow Street, Suite 11, Cambridge, Massachusetts 02138. ActBlue operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

12.  Upon information and belief, Defendant Airbnb, Inc. ("Airbnb") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 99 Rhode Island Street, San Francisco, California 94103. Airbnb operates in the

Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

13. Upon information and belief, Defendant Pound Payments Escrow Services, Inc. DBA Balanced Payments ("Balanced") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 555 Bryant Street, PMB 436, Palo Alto, California 94301. Balanced operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

14. Upon information and belief, Defendant Clinkle Corporation ("Clinkle") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 395 Page Mill Road, Palo Alto, CA 94306. Clinkle operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

15. Upon information and belief, Defendant Coinbase, Inc. ("Coinbase") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Bluxome Street, Suite 410, San Francisco, California 94107. Coinbase operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

16. Upon information and belief, Defendant Coinlab, Inc. ("Coinlab") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 71 Columbia Street, Suite 300, Seattle, Washington 98104. Coinlab operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

17. Upon information and belief, Defendant Dwolla, Inc. ("Dwolla") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of

business at 666 Walnut Street, Suite 1830, Des Moines, Iowa. On or about January 25, 2012, Dwolla incorporated in Delaware; at all other relevant times, it was incorporated in Iowa. Dwolla was an Iowa-licensed money transmitter from October 8, 2009 until October 1, 2011 when its license was cancelled. Dwolla operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

18. Upon information and belief, Defendant Facebook, Inc. ("Facebook") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1601 Willow Park, Menlo Park, California 94025. Facebook operates in the Northern District of California and itself and at times though its subsidiary, Facebook Payments, Inc., routinely has conducted and continues to conduct interstate commerce as a money transmitter.

19. Upon information and belief, Defendant Facebook Payments, Inc. ("Facebook Payments") is a subsidiary corporation of Facebook, Inc. organized and existing under the laws of the State of Florida, with its principal place of business at 1601 Willow Park, Menlo Park, California 94025. Facebook Payments applied for a money transmission license under the MTA on December 13, 2011 and was granted a license on February 3, 2012. Facebook Payments operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter on behalf of its parent company, Facebook, Inc.

20. Upon information and belief, Defendant GoPago, Inc. ("GoPago") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 44 Montgomery Street, Suite 250, San Francisco, California 94104. GoPago applied for a money transmission license under the MTA on September 13, 2012. GoPago operates in

the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

21. Upon information and belief, Defendant Gumroad, Inc. ("Gumroad") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 130 Langton Street, San Francisco, California 94103. Gumroad operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

22. Upon information and belief, Defendant Square, Inc. ("Square") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 110 5th Street, San Francisco, California 94103 and a place of business at 6150A Delmar Blvd., Suite 200, St. Louis, MO 63112. Square applied for a money transmission license under the MTA on April 27, 2012 and was granted the license on October 8, 2012. Lawrence Summers, former Secretary of the Treasury, is a Director of Square, Inc. Square operates in the Northern District of California and routinely has conducted and continues to conduct interstate commerce as a money transmitter.

23. Upon information and belief, Defendant The Board of Trustees of the Leland Stanford Junior University ("Stanford") is a not-for-profit corporation organized under the laws of the State of California, with its principal place of business in Stanford, California. Stanford operates in the Northern District of California and routinely has conducted and continues to conduct commerce as a money transmitter.

24. Upon information and belief, Defendants A-Grade Investments LLC and A-Grade Investments II LLC (collectively, "The A-Grade Funds") are limited liability companies organized under the laws of the State of Delaware, with their principle place of business at 10345 W. Olympic Boulevard, Los Angeles, California 90064. The A-Grade Funds share common

management and are venture capital funds invested in a number of unlicensed money transmitters.

25. Upon information and belief, Defendants Andreessen Horowitz, LLC, Andreessen Horowitz Fund I, LP, Andreessen Horowitz Fund I-A, LP, Andreessen Horowitz Fund I-B, LP, Andreessen Horowitz Fund II, LP, Andreessen Horowitz Fund II-A, LP, Andreessen Horowitz Fund II-B, LP, Andreessen Horowitz Fund III, LP, Andreessen Horowitz Fund III (AIV), LP, Andreessen Horowitz Fund III-A, LP, Andreessen Horowitz Fund III-B, LP and Andreessen Horowitz Fund III-Q, LP (collectively, "The AH Funds") are limited partnerships with the exception of Andreessen Horowitz LLC, a limited liability company, organized under the laws of the State of California, with their principal place of business at 2865 Sand Hill Road, Suite 101, Menlo Park, California 94025. The AH Funds share common management and are venture capital funds invested in a number of unlicensed money transmitters.

26. Upon information and belief, Defendants Digital Sky Technologies, Limited and DST Global, Limited are limited liability companies organized under the laws of the British Virgin Islands. Defendants DSTG-2 2011 Advisors, LLC, DSTG-2 2011 Investors DLP, LLC, and DSTG-2 2011 Investors Onshore, LP are limited liability companies and limited partnerships, according to their respective suffixes, organized under the laws of the State of Delaware. These five entities (collectively, "The DST Funds") have a principal place of business at 200 West Street, New York, New York 10282. The DST Funds share common management and are venture capital funds invested in a number of unlicensed money transmitters.

27. Upon information and belief, Defendants Kleiner Perkins Caufield & Byers, LLC, Kleiner Perkins Caufield & Byers XIII, LLC, Kleiner Perkins Caufield & Byers XIII Founders Fund, LLC, Kleiner Perkins Caufield & Byers XIV, LLC, and Kleiner Perkins Caufield & Byers XV, LLC (collectively, "The KPCB Funds") are limited liability companies organized under the

laws of the State of Delaware, with their principal place of business at 2750 Sand Hill Road,
Menlo Park, California 94025. The KPCB Funds share common management and are venture
capital funds invested in a number of unlicensed money transmitters.

28. Upon information and belief, Defendants Sequoia Capital, LLC, Sequoia Capital
New Projects, LLC, Sequoia Capital XII, LP, SC XII Management, LLC, Sequoia Capital XII
Principals Fund, LLC, Sequoia Capital Scout Fund I, LLC, Sequoia Capital Scout Fund II, LLC,
Sequoia Capital U.S. Scout Fund III, LLC, Sequoia Capital U.S. Scout Seed Fund 2013, LP, and
Sequoia Technology Partners XII, LP (collectively, "The Sequoia Funds") are limited liability
companies and limited partnerships, according to their respective suffixes, organized under the
laws of the State of Delaware, with their principal place of business at 3000 Sand Hill Road,
Suite 180, Menlo Park, California 94025. The Sequoia Funds share common management and
are venture capital funds invested in a number of unlicensed money transmitters.

29. Upon information and belief, Defendants Y Combinator, LLC, Y Combinator Fund I,
LP, Y Combinator Fund I GP, LLC, Y Combinator Fund II, LP, Y Combinator Fund II GP,
LLC, Y Combinator RE, LLC, Y Combinator S2012, LLC, and Y Combinator W2013, LLC
(collectively, "The YC Funds") are limited liability companies and limited partnerships,
according to their respective suffixes, organized under the laws of the State of Delaware, with
their principal place of business at 320 Pioneer Way, Mountain View, California 94041. The YC
Funds share common management and are venture capital funds invested in a number of
unlicensed money transmitters.

30. Upon information and belief, Defendant Brian Chesky is an individual with his
primary place of residence in San Francisco, California, within this District. Mr. Chesky, who is
also the founder and Chief Executive Officer of Defendant Airbnb, Inc., is sued in his personal
capacity on the basis of his personal investment in and partial ownership of Defendant Balanced.

10

31. Upon information and belief, Defendant Max Levchin is an individual with his primary place of residence in San Francisco, California, within this District. Mr. Levchin, who is also a co-founder and former Chief Technology Officer of prominent licensed money transmitter PayPal, Inc., is sued in his personal capacity on the basis of his personal investment in and partial ownership of Defendant Gumroad.

32. Upon information and belief, Defendant Yuri Milner is an individual with his primary place of residence in Moscow, Russia, and a residence at 13310 La Paloma Road, Los Altos Hills, California 94022, within this District. Mr. Milner, who is also an officer of Defendants The DST Funds, is sued in his personal capacity on the basis of his personal investment in and partial ownership of Defendants The YC Funds, and by extension, Defendants Airbnb, Balanced and Coinbase.

33. Upon information and belief, Defendant Yishan Wong is an individual with his primary place of residence in San Francisco, California, within this District. Mr. Wong, a former employee of Defendant Facebook, Inc. and a former employee of prominent licensed money transmitter PayPal, Inc., is sued in his personal capacity on the basis of his personal investment in and partial ownership of Defendant Balanced.

## FACTUAL BACKGROUND

### A. The California Money Transmission Act of 2010

34. On August 20, 2010, the California General Assembly voted for passage of Assembly Bill 2789, the Money Transmission Act. The MTA, sponsored exclusively by a financial industry lobbying group called "The Money Services Round Table" (which then counted among its members American Express, Western Union, Travelex, and MoneyGram International) and written with the assistance of DFI Deputy Commissioner Robert Venchiarutti, combined three prior California laws regulating financial institutions into one. It also established new

requirements for entities wishing to transmit money domestically (*i.e.*, within the United States). Prior to the enactment of the MTA, only California money transmitters dealing in the international transmission of funds had been regulated by the State of California.

35. On September 30, 2010, Governor Arnold Schwarzenegger signed into law California AB 2789 as the California Money Transmission Act, and the MTA became law effective January 1, 2011, with a six-month grace period allowing existing, unlicensed money transmitters to continue operations until July 1, 2011, at which point an application for a license was required to be on file with the DFI in order to legally continue to conduct business as a money transmitter.

36. Only a small number of startups, including Plaintiff, took the MTA seriously enough to inquire with the DFI about obtaining a license before the grace period expired. Many other startups, including all those Defendants engaged in money transmission activities, continued to transmit money without a license, and over time found themselves encouraged by the DFI's general lack of enforcement.

37. President George H.W. Bush signed the Housing and Community Development Act of 1992 into law on October 28, 1992, creating 18 U.S.C. § 1960 ("Section 1960") in an attempt to bolster law enforcement tools for the so-called "war on drugs." Section 1960 made it a federal crime to violate any state money transmission statute at a time when money transmission generally occurred over proprietary networks controlled by commercial entities such as banks, Western Union, and MoneyGram, and law enforcement officials had provided testimony that such transmissions were being used to fund drug cartels.

38. In April, 1995, the National Science Foundation decommissioned NSFNET, paving the way for the commercial internet. Interstate money transmission began taking place over the internet approximately four years later on a routine basis, but Section 1960 was not amended until Congress passed the USA PATRIOT Act in October, 2001, when Congress's focus was

terrorism and the funding thereof. Thus, § 373 of the USA PATRIOT Act has been construed as

modifying 18 U.S.C. § 1960 by broadening the meaning of an "unlicensed money transmitting

business" to, according to the Commonwealth of Massachusetts, "eliminate the need to prove

that the business knowingly operated without a license. In addition, the definition [of

"unlicensed money transmitter"] includes anyone who fails to register as a money transmitter

with FinCEN."[1]

39. The United States Department of the Treasury does coordinate the registration of

money transmitters through its FinCEN division, but this function exists mainly as a data

collection mechanism to prevent fraud due to the requirements of the BSA.

40. Today, given that Section 1960 was neither designed nor amended with the internet

(let alone mobile payments) in mind, any entrepreneur who hopes to create a money transmission

technology useful to consumers and/or offer a valuable service in a neighborhood store, must

confront the specter of 18 U.S.C. §1960(a), which provides: "Whoever knowingly conducts,

controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting

business, shall be fined in accordance with this title or imprisoned not more than 5 years, or

both." Even if such entrepreneurs retain counsel, implement appropriate risk controls, and apply

for money transmission licenses in their respective home states, the full weight of the federal law

enforcement system, including the penal system, is ready and waiting to punish as a violation of

federal law the violation of some state's MTL that will ineluctably follow. For such a criminal

violation to occur merely requires a money transmitter to transact routine business from any state

in which it is licensed into any other state in which it is not licensed, and likely cannot ever

become licensed because of the arbitrary and constitutionally impermissible barriers to interstate

commerce imposed by the licensure requirements of the MTLs of California and such other

---

[1] *See* http://www.mass.gov/ocabr/business/banking-services/industry-letters/usa-patriot-act.html.

states. In the context of the current fragmented and inconsistent state regulatory systems for money transmission, the federal statute is much easier to violate without having any criminal *mens rea* than it is to comply with, and the absence of a uniform, federally enacted and enforced system for nationwide licensing requirements of money transmitters, coupled with the arbitrary and constitutionally impermissible licensure requirements imposed by the State of California and certain other states, needlessly criminalizes behavior that is intended to benefit society and chills interstate commerce by precluding new entrants into the marketplace, and by restricting the free flow and implementation of technological developments in payment systems that are designed to benefit merchants and consumers and would stimulate competition in the consumer credit and payment markets.

41. California is one of forty-six states (plus the District of Columbia and certain U.S. territories) that enforces MTLs related to domestic money transmission and stored value (see attached Schedule B). Each MTL requires the entity wishing to transmit money in that jurisdiction to fill out completely different forms; pay different application fees on differing bases; raise surety bonds of differing amounts in the absence of a federal insurance program for money transmitters similar to the Federal Deposit Insurance Corporation (FDIC); meet different minimum net worth and/or asset size requirements; provide fingerprints and data for criminal background checks in differing formats; register with different state agencies unrelated to finance for differing purposes; wait different lengths of time for approval; and post-licensure, to provide different reports at different frequencies containing different data to different agencies.

42. The MTA's specific requirements for new money transmitters wishing to hold and transmit funds domestically or internationally are complex[2] and among the most onerous in the nation when compared with the requirements of most other states. The MTA requires $500,000 in "tangible net worth" (shareholder equity) at all times, in addition to a $250,000 surety bond for companies engaging in money transmission, a $500,000 surety bond for companies providing stored value products, a non-refundable $5,000 application fee, a criminal background check, a business plan, pro-forma financial statements for three years, audited past financial statements, the formal paper application, and a pre-application interview. These minimum figures do not scale downward depending upon on an applicant's size, volume of business, or risk model.

43. In contrast, many other states have different, and less onerous, requirements. The State of Alabama requires a $25,000 surety bond with its MTL application, a fee under $500, and no interview. The State of Pennsylvania requires a $1,000,000 surety bond with its MTL application but has no tangible net worth requirement. The State of Hawaii requires a $1,000 scalable surety bond with its MTL application and prefers digital fingerprints, which the State of Louisiana disallows. The State of Maryland charges one application fee in even-numbered years, and another application fee in odd-numbered years. Though different states take different lengths of time to evaluate MTL applications, all routinely take several months to reach their respective conclusions.

44. Despite this less-than-straightforward and hardly ideal regulatory structure for money transmitters, different companies have responded in different ways. Some companies, unable to operate in a legal fashion, joined together with Plaintiff to work with legislators on potential

---

[2] At a March 11, 2013 oversight hearing regarding the MTA before the California Assembly Banking and Finance Committee, DFI Commissioner Teveia Barnes stated, "It's really an art form in the sense that we don't treat every applicant exactly the same." She further stated that the DFI is biased towards larger, established entities when she explained, "So a money transmitter that's been operating in thirty-five states that comes to us, you know we're going to be able—and they're being examined by other states—we're going to have the benefit of those prior examinations."

changes to the MTA, while others decided to ignore the law entirely, not out of civil disobedience and a desire to improve the regulatory system, but out of a desire to profit from its disarray. Those who actively decided to ignore the law either continued operating their money transmission businesses, or began to seek funding for a new business involving money transmission.

45. Venture capital firms investing in the payment space know or should have known about money transmission statutes, at the very least because of PayPal, Inc.'s initial public offering in 1999 and venture capital's integral role in that event. At the time, PayPal lacked many of the state money transmission licenses it required, and had to scramble to obtain them at the last minute so that it would be in compliance with state and federal law as a publicly traded corporation.

46. The MTA restricts all entities wishing to do business with California residents, and not just entities physically located in California. Therefore, despite being a state law, the MTA's scope and reach extend far beyond California's borders, encompassing the entire nation.

**B.    Plaintiff's Activity as a Lawful MSB**

47. Plaintiff operated the FaceCash mobile payment system and ThinkLink integrated payment and accounting platform from April, 2010 through June 30, 2011, immediately prior to the expiration date of the MTA grace period. Given that DFI Deputy Commissioner Venchiarutti had threatened Plaintiff's officers with incarceration for continuing to operate as a MSB past this date, and given the severe federal penalties outlined in Section 1960, Plaintiff returned all customer funds to the maximum extent possible and ceased advertising FaceCash and ThinkLink as payment systems.

48. As a result of the coerced shutdown of FaceCash, Plaintiff was forced to forego its million-dollar investment in the FaceCash and ThinkLink infrastructure, associated assets, and

engineering talent that had made the system so successful. Over a period of months, Plaintiff dismissed all of its employees and contractors excluding its founder and moved out of its office space. Plaintiff was further forced to sacrifice the potential future revenue stream that would have inevitably arisen from its strong presence in the mobile payments market.

49. The shutdown was completely avoidable. Plaintiff had already secured two money transmission licenses from Alabama and Idaho at the time of the shutdown. While the DFI's criteria for licensure under the MTA were arbitrary, capricious, and unconstitutional in myriad ways, they would have presented no problem whatsoever had Plaintiff been able to convince venture capital investors to contribute capital to the company. Multiple investors were impressed with Plaintiff's technology and business model, but they claimed that regulatory considerations, e.g. MTLs, made it impossible for them to invest. Most investors made verbal statements to this effect, but two put it in writing.

50. In some cases, these same investors proceeded to invest hundreds of millions of dollars in other companies subject to the exact same regulatory considerations. In these cases, the corporations seeking capital either made material omissions to their investors, and/or their investors were negligent for failing to examine the regulatory implications of their proposed businesses. Once regulatory issues were eventually brought to light, only in rare cases did the affected companies cease operating as money transmitters.[3]

51. In other cases, these same investors *knew* that the same regulatory considerations surrounding a given investment opportunity presented an obstacle, but realized how much money they could potentially make, and how infrequently the DFI and similar enforcement agencies enforced the MTA and other similar statutes. In these cases, the investors actively decided to

[3] The only known example of such a "pivot" involves Mountain View, California-based Clover, Inc., which offered peer-to-peer payments when it received a $5.5 million financing round from Defendants The AH Funds in April, 2011, but abruptly changed its business model to entirely avoid handling money transmission, focusing instead on tablet-based cash register software.

help their portfolio companies break as many laws as necessary in order to "execute" each company's vision.

52. The enthusiastic willingness of investors to unlawfully fund the unlawful competitors of Plaintiff—to the tune of many hundreds of millions of dollars in aggregate—has severely damaged Plaintiff and Plaintiff's ability to compete in the marketplace.

**C.    Unlawful, Unfair and Fraudulent Actions of the Unlicensed MSB Defendants**

53.  Defendants ActBlue, LLC, Airbnb, Inc., Pound Payments Escrow Services, Inc. DBA Balanced Payments, Clinkle Corporation, Coinbase, Inc., Coinlab, Inc., Dwolla, Inc., Facebook, Inc., Facebook Payments, Inc., GoPago, Inc., Gumroad, Inc., Square, Inc., and The Board of Trustees of the Leland Stanford Junior University (collectively, "Unlicensed MSB Defendants") are organizations that as part of their operations regularly hold and transmit funds on behalf of third parties, such as their customers and vendors.  By virtue of their direct involvement in the payments space they were direct competitors of Plaintiff while Plaintiff could lawfully operate as a MSB, and would remain competitors if Plaintiff were able to operate as a MSB once again.

54. The Unlicensed MSB Defendants are not exempt from the MTA per any statutory language, and although the DFI has issued two regulatory opinions concerning the MTA, those opinions also do not exempt any of the Unlicensed MSB Defendants from the MTA's requirements.

55. The Unlicensed MSB Defendants have never applied for a license under the MTA, except for Facebook Payments, GoPago and Square, which each applied for a license under the MTA long after the grace period for applications expired on June 30, 2011.  The Unlicensed MSB Defendants continue to transmit money to and from California customers in violation of the BSA, Section 1960, the MTA, and several other MTLs on an ongoing basis.

56. Defendant ActBlue LLC aggregates political donations for candidates running for political office by allowing citizens to donate on-line using a payment card. ActBlue then holds the funds, and cuts checks to the candidates on a regular basis. Some of the candidates ActBlue has raised money for are the very same California politicians who originally passed the MTA and/or have admitted to serious problems with the MTA. ActBlue does not have a money transmitter license in California or any other state, nor is ActBlue registered with FinCEN as a MSB.

57. Defendant Airbnb, Inc. allows its customers to rent the homes of other customers for varying durations, in lieu of a hotel. To process each transaction it holds onto the customer's funds, and remits those funds to the property owner at the conclusion of the stay, minus its fee. The news web site *Business Insider* published an article on July 11, 2012 entitled "This Innovation-Killing California Law Could Get A Host of Startups In Money Trouble," authored by Owen Thomas[4], which stated: "We asked the DFI if it believes the law applies to Airbnb. The answer: Yes. Had Airbnb sought and received an exemption from the law? The answer: No."[5] Airbnb does not have a money transmitter license in California or any other state, nor has Airbnb ever registered with FinCEN as a MSB.

58. Defendant Pound Payments Escrow Services, Inc. DBA Balanced Payments allows programmers to use its Application Programming Interface (API) to debit and credit bank accounts directly through the Automated Clearing House (ACH) electronic check clearing system, or via payment card. To accomplish this feat it must hold onto client funds. Balanced does not have a money transmitter license in California or any other state, but registered with FinCEN as a MSB as of March 14, 2011.

---

[4] *See* http://www.businessinsider.com/california-money-transmitter-act-startups-2012-7.

59. Defendant Clinkle Corporation facilitates peer-to-peer payments using pre-paid accounts or payment cards through a mobile device. To accomplish this feat it must hold onto client funds. Clinkle does not have a money transmitter license in California or any other state, nor has Clinkle ever registered with FinCEN as a MSB.

60. Defendant Coinbase, Inc. is a Bitcoin exchange. It allows its customers to exchange United States Dollars for units of the digital currency known as Bitcoin. To accomplish this feat it must hold onto client funds. Bitcoin is an anonymous cryptocurrency used to purchase, among other goods, illegal narcotics, controlled substances, and child pornography, and used as a reserve for currency speculators. FinCEN issued Guidance FIN-2013-G001, "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies" on March 18, 2013, which states that, "The definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies. Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the BSA." Coinbase does not have a money transmitter license in California or any other state, but registered with FinCEN as a MSB as of April 22, 2013.

61. Defendant Coinlab, Inc. is a Bitcoin exchange. It allows its customers to exchange United States Dollars for units of Bitcoin. To accomplish this feat it must hold onto client funds. Coinlab does not have a money transmitter license in California or any other state, but registered with FinCEN as a MSB as of April 7, 2013.

62. Defendant Dwolla, Inc. allows customers to pre-fund closed-loop debit accounts using ACH, much in the same way that Plaintiff allowed its customers to fund FaceCash accounts when FaceCash was operational. The majority of Dwolla's transaction volume has

---

[5] Airbnb's co-founders were also the subject of a May 31, 2011 article entitled "Did Airbnb Scam Its Way To $1 Billion?" by Ryan Tate focusing on the company's unsolicited, duplicitous mass e-mail campaign in blatant violation of the CAN-SPAM Act. This clearly unlawful activity was reportedly instrumental in convincing Defendants The AH Funds that they should invest in Airbnb.

stemmed from interest in Bitcoin, though Dwolla has described its business in a false and misleading fashion on a number of occasions as being related to traditional "mobile payments." Dwolla applied for a money transmission license in Iowa on October 5, 2009, which was issued three days later on October 8, 2009. That license was cancelled on October 1, 2011. Dwolla does not have and never has had a money transmitter license in California, nor has Dwolla ever registered with FinCEN as a MSB.[6]

63. Defendant Facebook, Inc. operated "Facebook Credits" beginning in May, 2009, and began forcing its third-party software developers to use Facebook Credits for all payment processing beginning on the same day that the MTA grace period for license applications expired, July 1, 2011. At the time, neither Facebook, Inc. nor its subsidiary Facebook Payments, Inc. even had an application for a license on file with the DFI.[7] Facebook Payments, Inc. applied for a license under the MTA on December 13, 2011, 166 days after the grace period for applications expired, and continued to operate throughout the 51 days that its application was being considered, for a total of 217 days during which time Facebook Payments, Inc. knowingly did not stop transmitting money in violation of the BSA, Section 1960, the MTA, and several

---

[6] Officers of Dwolla have publicly claimed that Dwolla's relationship with a non-chartered Credit Union Service Organization (CUSO) called The Veridian Group exempts it from money transmission statutes, but no such exemption for CUSO investments in technology companies exists in any statute.

[7] On October 25, 2012, in a decision in an ongoing federal civil lawsuit between a minor and Facebook, Inc. (Northern District of California, Case No. 4:12-cv-01894-CW), District Judge Claudia Wilken established a new definition of "open-loop" pertaining directly to the MTA that has no foundation in the MTA or prior caselaw. According to Judge Wilken, Facebook Credits are not considered money transmission or stored value, and are "closed-loop," because Facebook users do not make use of their Credits "for goods and services outside the Facebook site." The MTA does make an exemption for closed-loop systems (e.g. in-store retail credit) involving "affiliates" of a given entity, but the MTA defines affiliates in Financial Code § 2003(a) as:

> "any person controlling, controlled by, or under common control with, that specified person, directly or indirectly through one or more intermediaries. For purposes of subdivisions (q) and (v),a specified person is affiliated with another person if that person controls, is controlled by, or under common control through the ownership directly or indirectly of shares or equity securities possessing more than 50 percent of the voting power of that specified person."

This does not describe Facebook's situation. On the Facebook web site, users can purchase Facebook Credits that are redeemable with completely independent corporations, such as Zynga, Inc., among many other game developers who are not affiliates of Facebook, Inc. or Facebook Payments, Inc. under the MTA.

other MTLs. Facebook Payments, Inc. registered with FinCEN as a MSB as of February 22, 2011.

64. Defendant GoPago, Inc. allows customers to enter their payment card information on a smartphone so that their cards can be charged automatically at the point of sale. GoPago applied for a license under the MTA on September 13, 2012, 440 days after the grace period for applications expired, and continues to operate without a license today while its application is under consideration, for a total of 675 days so far during which time GoPago, Inc. knowingly has not stopped transmitting money in violation of the BSA, Section 1960, the MTA, and several other MTLs. GoPago registered with FinCEN as a MSB as of October 1, 2012.

65. Defendant Gumroad, Inc. allows customers to set up on-line storefronts for particular products so that they may sell items without worrying about payment processing, which Gumroad handles for them. To accomplish this feat it must hold onto client funds. Gumroad does not have and never has had a money transmitter license in California, nor has Gumroad ever registered with FinCEN as a MSB.

66. Defendant Square, Inc. processes payment card transactions through the use of a plastic dongle that attaches to smartphones, holds the funds, and then transfers them to merchants. Square was the subject of a cease and desist order issued by the Illinois Department of Financial & Professional Regulation on January 22, 2013 stating with regard to the Illinois Transmitters of Money Act, 205 ILCS 657/1 *et seq.*, "Square has never been licensed by the Department to engage in the business of transmitting money pursuant to the Act," and "As of the date of this order, Square continues to engage in the business of transmitting money in Illinois without a license." Square, Inc. applied for a license under the MTA on April 27, 2012, 302 days after the grace period for applications expired, and continued to operate throughout the 163 days that its application was being considered, for a total of 465 days during which time Square,

Inc. knowingly did not stop transmitting money in violation of the BSA, Section 1960, the MTA, and several other MTLs. Square registered with FinCEN as a MSB as of December 3, 2012.

67. Defendant The Board of Trustees of the Leland Stanford Junior University processes payment card transactions under the name "Cardinal Dollars" by allowing students and other affiliates to swipe their university identification cards at participating third-party merchants who accept the cards. Stanford holds onto the funds and disperses them to the merchants, typically restaurants who lease space from the University. Stanford does not have a money transmitter license in California or any other state, nor has Stanford ever registered with FinCEN as a MSB.

68. The Unlicensed MSB Defendants have, on an ongoing basis, willingly and enthusiastically violated not only the California MTA, but the laws of several other states and territories that require licenses for money transmission, as well as the BSA and Section 1960.

**D. Unlawful, Unfair and Fraudulent Actions of the Venture Capital Defendants**

69. Defendants The A-Grade Funds, The AH Funds, The DST Funds, The KPCB Funds, The Sequoia Funds, The YC Funds, Brian Chesky, Max Levchin, Yuri Milner, and Yishan Wong (collectively, "Venture Capital Defendants") are professional institutional investors and angel investors that as part of their operations regularly invest in startup companies, mostly in the high technology field. The Venture Capital Defendants, despite being perpetually surrounded by legal counsel at a number of established law firms, multiple veteran executives of the payments industry, and despite being acutely aware of the law on both the state and federal levels, have made enormous investments in the Unlicensed MSB Defendants with the intent of helping them to violate state and federal law for as long as it might take to earn a significant financial return—only at which point it might be worth (in their view) considering legal compliance with the MTA, other similar MTLs, the BSA, and Section 1960.

70. Defendants The A-Grade Funds invested in Unlicensed MSB Defendants and other companies, including but not limited to Airbnb (part of a $112 million Series B financing round), Balanced (part of a $1.4 million seed financing round and part of a $3.4 million seed financing round) and Dwolla (part of a $5 million Series B financing round).

71. Defendants The AH Funds invested in Unlicensed MSB Defendants and other companies, including but not limited to Defendants Airbnb (part of a $112 million Series B financing round), Balanced (part of a $3.4 million seed financing round), and Dwolla (part of a $16.5 million Series C financing round). Marc Andreessen, General Partner of The AH Funds, is on the Board of Directors of Defendant Facebook, Inc. As of October, 2011, the AH Funds are also investors in The YC Funds through the "Y Combinator Start Fund."

72. Defendants The DST Funds invested in Unlicensed MSB Defendants and other companies, including but not limited to Defendants Airbnb (part of a $112 million Series B financing round) and Facebook (a $200 million Series D financing round).

73. Defendants The KPCB Funds invested in Unlicensed MSB Defendants and other companies, including but not limited to Defendants Gumroad (part of a $7 million Series A financing round) and Square (part of a $100 million Series C financing round).

74. Defendants The Sequoia Funds invested in Unlicensed MSB Defendants and other companies, including but not limited to Defendants Airbnb (part of a $7.2 million Series A financing round) and Square (part of a $27.5 million Series B financing round). The Sequoia Funds were also the lead investor in an $8.25 million financing round for Defendants The YC Funds in March, 2010.

75. Defendants The YC Funds invested in Unlicensed MSB Defendants and other companies, including but not limited to Defendants Airbnb ($20,000), Balanced (part of a $3.4 million seed financing round), and Coinbase (part of a $600,000 seed financing round).

76. Defendant Brian Chesky personally invested in Defendant Balanced (part of a $3.4 million seed financing round).

77. Defendant Max Levchin personally invested in Defendant Gumroad (part of a $1.1 million seed financing round). In a November 12, 2012 e-mail to Plaintiff he wrote, "I'm not actually familiar with the latest MTA laws in CA (though I should be)."

78. Defendant Yishan Wong, in response to an article authored by Plaintiff on the web site Quora, wrote the following comments (among others) indicating his knowledge of payments-related laws and regulations on June 15, 2011:

> "Yeah, I am constantly amazed at how people haven't yet learned that the payments industry is really hard to get into. It was okay for first-wave companies like PayPal to be surprised by it, but anyone who does their due diligence before starting a payments startup should know everyone – literally everyone, including regulators and the government – is going to be working against you. If you can't take the heat, get out of the kitchen and go start a photosharing startup."

> "Payment startups face a far more adversarial environment, including utter and total hostility. It was okay for PayPal to whine about this (though they didn't), because it wasn't known. But now it's known. If you run a payments startup, you are fighting against thugs, actual criminals – both real ones and government ones. It is not normal business. It is like trying to start a business in an actual warzone. Complaining about this is just whining. There is no actual solution than to win. Anything else is, in fact, just whining."

Presumably with the hope of "winning," Defendant Wong proceeded to invest his own personal funds in Unlicensed MSB Defendant Balanced (part of a $3.4 million seed financing round).

79. Defendant Yuri Milner personally invested in The YC Funds and/or individual portfolio companies of The YC Funds as of October, 2011 through the "Y Combinator Start Fund." Mr. Milner may therefore have ownership in Unlicensed MSB Defendants including but not limited to Airbnb, Balanced and Coinbase.

### E.      Effects of the Collective Actions of Defendants on Plaintiff

80. The Venture Capital Defendants used massive capital infusions in unlawful enterprises as a deliberate anti-competitive tactic and "execution" "strategy" designed to prevent

other law-abiding companies, forced to grow at a much slower or non-existent pace, from being able to compete effectively in the marketplace.[8]

81. To the extent that the Venture Capital Defendants may have been unaware of the regulatory framework governing companies in the payments space, the Venture Capital Defendants were grossly negligent, and their negligence resulted in harm to other companies attempting to lawfully compete effectively in the marketplace.

82. To the extent that the Venture Capital Defendants were not negligent, but may not have been informed of the regulatory obligations applying to the Unlicensed MSB Defendants by the officers of those companies, the Unlicensed MSB Defendants deliberately, deceptively and fraudulently withheld material information to induce the Venture Capital Defendants to transfer, in aggregate, hundreds of millions of dollars to the possession of the Unlicensed MSB Defendants, as an anti-competitive tactic intended to harm to other companies attempting to lawfully compete effectively in the marketplace.

83. On November 30, 2010, Plaintiff was rejected as a potential portfolio company by Roelof Botha on behalf of Defendants The Sequoia Funds due to The Sequoia Funds' then-existing commitment to invest in Unlicensed MSB Defendant Square.

84. On July 18, 2011, Plaintiff was rejected as a potential portfolio company by Connie Chan on behalf of Defendants The AH Funds. As Ms. Chan wrote in an e-mail, "we were nervous about the regulatory issues and barriers to obtaining licenses necessary in each state. That process, as you described, is not a quick and easy one and is necessary to get heavy traction in user and merchant adoption." This same fear of "regulatory issues and barriers" did not apply, nonetheless, to The AH Funds' subsequent investments in Unlicensed MSB Defendants Airbnb (six days later), or Balanced (two years later), or Dwolla (two years later).

---

[8] Two phrases oft-repeated among Silicon Valley entrepreneurs, "It's not the idea; it's the execution," and "Move

85. Though not party to this lawsuit, the law firms used by all Defendants are themselves unlicensed money transmitters in violation of the MTA to the extent that they hold or transmit any client funds.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 Against Unlicensed MSB Defendants

86. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

87. Unlicensed MSB Defendants engaged in unlawful acts and practices committed pursuant to business activity, namely, the repeated unlicensed and unapproved transmission of third-party funds, forbidden by the California Money Transmission Act of 2010, codified at Cal. Fin. Code § 2000 *et seq*. Specifically, Unlicensed MSB Defendants violated Cal. Fin. Code § 2030, which states, "A person shall not engage in the business of money transmission in this state, or advertise, solicit, or hold itself out as providing money transmission in this state, unless the person is licensed or exempt from licensure under this division or is an agent of a person licensed or exempt from licensure under this division."

88. Unlicensed MSB Defendants engaged in unlawful acts and practices committed pursuant to business activity, namely, the repeated unlicensed and unapproved transmission of third-party funds, forbidden by various state MTLs[9] according to the respective locations of recipients of those funds.

89. Unlicensed MSB Defendants engaged in unlawful acts and practices committed pursuant to business activity, namely, the conducting, controlling, managing, supervising,

---

fast and break things," summarize the pervasive and corrupting ethos of success at any cost, even if the "things" being broken are laws.

[9] A detailed schedule of state MTLs and their respective statutory requirements can be found on pages 162-302 of Docket Entry No. 47, Northern District of California Case No. 5:11-cv-05496-HRL, also available via PlainSite at http://www.plainsite.org/flashlight/download.html?id=31313747.

directing, and/or owning of an unlicensed money transmission business, forbidden by 18 U.S.C.
§ 1960(a).

90. Unlicensed MSB Defendants engaged in unlawful acts and practices committed
pursuant to business activity, namely, the knowing transmission of funds in excess of $10,000
without reporting such transmissions to the United States Department of the Treasury as required
by 31 U.S.C. § 5316.

91. Unlicensed MSB Defendants engaged in unlawful acts and practices committed
pursuant to business activity, namely, the failure of Unlicensed MSB Defendants to maintain a
Bank Secrecy Act Anti-Money Laundering program as required by 31 U.S.C. § 5318 and
associated regulations in 31 C.F.R. § 103.

92. Unlicensed MSB Defendants engaged in unlawful acts and practices committed
pursuant to business activity, namely, the failure of Unlicensed MSB Defendants to register with
FinCEN on the date that their respective money transmission businesses were established as
required by 31 U.S.C. § 5330.

    a) Unlicensed MSB Defendants ActBlue, Airbnb, Clinkle, Dwolla, Facebook, Gumroad,
       and Stanford completely failed to register with FinCEN as of the date this complaint
       was prepared;

    b) Unlicensed MSB Defendants Balanced, Coinbase, Coinlab, Facebook Payments,
       GoPago, and Square waited until months after they began conducting MSB
       operations to register with FinCEN.

93. Unlicensed MSB Defendants engaged in unfair competition detrimental to Plaintiff
by knowingly competing in the marketplace for digital payment technologies simultaneous with
Plaintiff, and simultaneous with their own ongoing unlawful activity.

94. Unlicensed MSB Defendants engaged in unfair competition by deliberately colluding with investors, including but not limited to Venture Capital Defendants, to raise venture capital funding for their illicit money transmission enterprises such that said funding would no longer be available to money transmission businesses pursuing growth legally, albeit at a slower pace, thereby extinguishing the ability of such companies to raise capital and enter the marketplace.

95. Unlicensed MSB Defendants engaged in unfair competition by distorting the economic environment such that institutional investors came to expect entrepreneurs to display a willingness to break the law in order to qualify for capital, thereby reducing the number of potential market entrants.

96. Unlicensed MSB Defendants engaged in fraud designed to mislead the public by making false statements in their terms of service documents indicating that Unlicensed MSB Defendants were not considered to be money transmitters.

## SECOND CLAIM

### Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 Against Venture Capital Defendants

97. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

98. Venture Capital Defendants each engaged in unlawful acts and practices committed pursuant to business activity, namely, the conducting, controlling, managing, supervising, directing, and/or partial owning of at least one, and often more than one, unlicensed money transmission business, forbidden by 18 U.S.C. § 1960(a).

99. Venture Capital Defendants engaged in unfair competition detrimental to Plaintiff as owners of Unlicensed MSB Defendants by knowingly competing in the marketplace for digital payment technologies simultaneous with Plaintiff and simultaneous with their own ongoing unlawful activity.

100.     Venture Capital Defendants engaged in unfair competition by deliberately colluding with entrepreneurs, including but not limited to the founders and officers of Unlicensed MSB Defendants, to provide venture capital funding for their unlawful money transmission enterprises such that said funding would no longer be available to money transmission businesses pursuing growth legally, albeit at a slower pace, thereby extinguishing the ability of such companies to raise capital and enter the marketplace.

## THIRD CLAIM

### Unjust Enrichment Against All Defendants

101.     Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

102.     Unlicensed MSB Defendants have been unjustly enriched by the infusions of hundreds of millions of dollars of venture capital made in order to facilitate the operation of money transmission businesses in violation of the law, when such capital might have been allocated to Plaintiff and/or other law-abiding money transmitters were it not for the unlawful actions of those Defendants.

103.     Unlicensed MSB Defendants have been unjustly enriched by earning profits on the basis of unlawful activity that they would not have earned otherwise.

104.     Unlicensed MSB Defendants have been unjustly enriched through their entitlement to benefits, including but not limited to health care plans and retirement plans, for which they qualified on the basis of their fraudulently-obtained financing and would not have qualified for otherwise.

105.     Venture Capital Defendants have been unjustly enriched by returns on investments made in order to facilitate the operation of money transmission businesses in violation of the law, where such investments were detrimental to Plaintiff's ability to compete in the marketplace.

## FOURTH CLAIM

### Violation of the Lanham Act False Advertising Statute Against Defendant Dwolla, Inc. (15 U.S.C. § 1125)

106.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

107.    Defendant Dwolla, Inc. has made and repeatedly allowed and/or encouraged

reporters to make false and misleading statements about the nature of its business.

108.    Dwolla was included in the Fast Company list of "The World's 50 Most

Innovative Companies" (http://www.fastcompany.com/most-innovative-companies/2012/dwolla)

with the following blurb:

> For creating a payments network that's completely independent of credit and debit
> cards.  Meaning you can walk into a store, see something you like, and, using its
> app, buy it by instantly transferring cash from your bank account to that store.
> It's a highly disruptive idea, and a hell of a thing to pull off in a payments world
> controlled by credit-card companies.  And yet, Dwolla's starting to make it
> happen.  The startup has already cut down money transfer wait times; partnered
> with 7,500 retailers; and linked its API to Facebook, Twitter, and LinkedIn.  It's
> now processing more than $1 million a week in transactions from 80,000 users
> and recently closed another $5 million funding round to fuel its growth.

A reasonable and objective reader of such a statement would conclude that Dwolla has a vibrant

mobile payments enterprise.  This is false.  A vast sum, if not the majority, of Dwolla's

transaction volume is the result of Bitcoin speculation, which is not referenced anywhere in the

article, and hardly mentioned on the company's web site.

109.    Dwolla was the subject of a November 11, 2011 *Business Insider* feature story

(http://www.businessinsider.com/this-28-year-old-is-making-sure-credit-cards-wont-exist-in-the-

next-few-years-2011-11) in which the company's CEO, Ben Milne, was quoted as saying,

"Ultimately we're trying to build the next Visa," within a few paragraphs of the reporter's

statement that "Milne has no finance background, yet his little operation is moving between $30

and $50 million per month; it's on track to move more than $350 million in the next year."

Despite clearly cooperating with the author of the article, Dwolla failed to correct or attempt to

correct the deliberately misleading notion that these monetary figures represented Dwolla's volume of lawful, retail transactions. In reality, these figures, if correct at all, represented Dwolla's processing of unlawful Bitcoin transactions.

110.    In the same article, Mr. Milne further stated, "In December of last year we figured out how to legally do what we do." This statement is blatantly false and designed to mislead both consumers and investors into believing that Dwolla is a legitimate MSB with proper government registration and approval.

111.    On behalf of Dwolla, Mr. Milne made additional false statements in the November 11, 2011 *Business Insider* story concerning the legality of his company's operations. Mr. Milne is quoted as stating in response to reporter inquiries:

> **Business Insider:** What did you do for the first two years when Dwolla wasn't technically legal?
> **Mr. Milne:** Well it was legal, we just couldn't operate outside of Iowa. For the first two years we built out the platform. We did a sh*tload of testing on a small scale because legally we couldn't launch Dwolla nationwide. We spent two years inside of Iowa fine-tuning Dwolla with the financial institutions, building out some of the initial models, and trying to figure out how to legally do what we do.
> **Business Insider:** How'd you find a legal loophole?
> **Mr. Milne:** Moving money is an exceptionally regulated business. We're in Iowa, which is sort of conservative — I don't know if that helped us or hurt us, but in the long term I think it helped us. We figured to do this legally, we had two options: we could take in a tremendous amount of money and go out and get licenses, which is how most people do it. But we didn't have access to that kind of capital here. The other option was to bring in really strategic investors, which is what we did. One of our investors is a financial institution; one is a financial services company. Our investors do credit and debit processing for banks. So when you get a credit card from your bank, it's being issued by companies like them. Our investors are also distributing our product to financial institutions. So we've been building a payment network, and we can do it legally because of who our investors are.
>
> We launched in December of last year and started moving $50,000 a week. Now we're hovering around $1 million a day. We hit that milestone in June or July. Now we've quieted things down. We had to tap the brakes because the way you handle money needs to be managed correctly. We have some new partners on board and we're going to hit it hard in December again. We've got some stuff coming out in December that we think should be really big.

Despite Mr. Milne's statement, there is no exception in any money transmission statute for "really strategic investors." Dwolla's movie-star investors do not exempt the company from state and federal law. Nor does investment from a non-chartered, separately incorporated subsidiary of a credit union magically exempt any company from state or federal law. Mr. Milne claims to know that his business is "exceptionally regulated." Therefore, Mr. Milne's statements are designed to deceive the public as to government approval of Dwolla's goods and services.

112.    Defendant Dwolla, Inc. engaged in fraud on November 6, 2012 when its "communications head," Jordan Lampe, was quoted on behalf of Dwolla in a PaymentsSource article entitled, "Dwolla, Veridian CU Describe and Defend Their Strange Symbiosis" authored by Bailey Reutzel. Referring to the Office of the Attorney General of Iowa, Mr. Lampe stated, "Understandably, ambiguity, half-truths, or traditional misunderstandings have continued to linger here and there, but not to the level of full-out 'investigation' that we or anyone else knows of. The fact remains that we whole-heartedly embrace these conversations — even encourage them." This statement was designed to and did in fact mislead the public into believing that Dwolla's service was legal and even approved by the Office of the Attorney General of Iowa.

## FIFTH CLAIM

### Gross Negligence Against Venture Capital Defendants

113.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

114.    Venture Capital Defendants were willfully and grossly negligent in failing to screen Unlicensed MSB Defendants, which eventually received hundreds of millions of dollars in venture capital financing, for regulatory issues related to money transmission that might impact their respective business plans and models.

115.    Due to the negligence of Venture Capital Defendants, Unlicensed MSB
Defendants were able to secure the transfer of enormous amounts of capital to themselves in
order to perform unlawful activities on an ongoing basis.

116.    Plaintiff has been substantially damaged due to the negligence of Venture Capital
Defendants, who would have recognized Plaintiff's responsible and forthright actions with
regard to legal compliance as an asset, rather than a supposed liability, when Plaintiff attempted
to raise venture capital funds from many of Venture Capital Defendants throughout 2010 and
2011. Instead, hundreds of millions of dollars combined flowed toward from Venture Capital
Defendants to Unlicensed MSB Defendants—the least responsible parties competing in the
payments space—causing harm to Plaintiff of a corresponding amount.

117.    Venture Capital Defendants knew or should have known about MTLs and the
corresponding federal laws governing their respective MSB portfolio companies' activities, and
should have either taken steps to ensure their compliance with those laws, or instructed their
respective MSB portfolio companies to cease MSB activities until compliance could be
achieved.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A permanent injunction enjoining all Defendants, their officers, investors, agents, employees,
   licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them,
   from engaging in money transmission activity without proper licensure or investing in money
   transmission businesses without proper proof of licensure and registration;

B. Recovery from all Defendants of damages, including pre-judgment interest Plaintiff
   sustained and will sustain, and any income, gains, profits, and advantages obtained by
   Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged

hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

C.  Punitive damages stemming from Defendants' ongoing and willful disregard for various state and federal laws;

D.  Judgment against Defendants on all counts of the Complaint;

E.  Plaintiff's reasonable costs and expenses of this action, including attorneys' fees (if any), in accordance with 42 U.S.C. § 1988 and other applicable law;

F.  Such other and further relief as the Court deems just and proper.

### REQUEST FOR CIVIL LOCAL RULE 3-9(b) EXEMPTION AND RETIREMENT

This complaint is not signed by a member of the Bar of this Court and Plaintiff is a corporation.  Civil Local Rule 3-9(b) requires corporations to retain counsel.  The circumstance in which a corporation nonetheless fails to retain counsel has been previously addressed in-depth in cases such as *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1221 (D. New Mexico, 2011).  In *Two Old Hippies*, the Court wrote, "there is a tension between the plain language of 28 U.S.C. § 1654 — 'In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.' — and the case law requiring corporations, partnerships, and other entities to have counsel in federal court." *Id*. at 1228.  The Court further cited the Honorable Jack Weinstein, United States District Court Judge for the Eastern District of New York, who pointed out that denying small corporations—for whom "[f]ailure of the 'corporation' is, for all practical purposes, the failure of the individual entrepreneur"—access to the courts is "unnecessarily harsh and unrealistic." *Id*.  The New Mexico Court completely agreed with Judge Weinstein, but regretted that nonetheless, "The Supreme Court has held corporations must be represented by counsel." *Id*. at 1229.

That was in 1993. The Supreme Court's decision in *Citizens United v. Federal Election Com'n*, 130 S. Ct. 876 (2010) overrules a great deal of precedent, including its prior decisions on corporate self-representation. In *Citizens United*, the Supreme Court ruled that "The Court has recognized that First Amendment protection extends to corporations." *Id*. at 899. The Court further explained that "political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Id*.

Courts are havens for political speech, and even non-political speech can take on important political implications by virtue of the fact that it is uttered in a court. Requiring corporations to appear in court through counsel unjustly limits the First Amendment protection afforded to corporations by the Supreme Court and runs counter to Congress's intent expressed in 28 U.S.C. § 1654, which makes no mention of any restriction on the ability of corporations to represent themselves "personally." The centuries-old (and more importantly, false) legal fiction that corporations cannot self-represent (because corporations are not people) ignores the obvious and fundamental fact that corporations may only be founded and operated by people—people who ultimately own the corporation and share its interests as a result, and who are easily capable of designating an appropriate representative, whether a member of the Bar or not. The tortured logic of the legal fiction is made even more apparent by the fact, also highlighted in *Two Old Hippies*, that partnerships are also themselves not people, but legal agreements between people—and yet partners in a partnership can self-represent.

*Citizens United* further states, "When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." *Id*. at 908. In this spirit, Plaintiff's

Board of Directors wishes Plaintiff's CEO, Aaron Greenspan, to represent Think Computer Corporation in this matter before the Court.

Lastly, Plaintiff is a sub-chapter S corporation registered as such with the Internal Revenue Service, 100% owned by Mr. Greenspan. Pursuant to the Internal Revenue Code, Plaintiff's tax burden is therefore solely attributed to Mr. Greenspan personally. Insofar as Plaintiff may have any interests in this case as a corporation, so too does Mr. Greenspan completely share those interests as a person, and to deny Mr. Greenspan the right to personally represent his own interests would amount to a modern form of taxation without representation and a stark violation of 28 U.S.C. § 1654.

Plaintiff therefore respectfully requests that Civil Local Rule 3-9(b) be retired, or that Plaintiff be exempted from the Rule given its particular ownership and tax structure.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury in this action of all issues so triable.

Respectfully submitted this 6th day of May, 2013.

Aaron Greenspan
Think Computer Corporation
884 College Avenue
Palo Alto, CA 94303-1303
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: legal@thinkcomputer.com